1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  ALLAN YANNOW, State Bar No. 63257
   Deputy Attorney General
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
7   Telephone:  (415) 703-5955
    Fax:  (415) 703-1234
8   Email:  Allan.Yannow@doj.ca.gov

9  Attorneys for Respondent

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                  SAN FRANCISCO DIVISION

13

   **RICHARD DIAZ,**                         C 07-2612 VRW (PR)
14
                                Petitioner,
15
           **v.**
16
   **DERRAL ADAMS, Warden,**
17
                                Respondent.
18

19
       **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER**
20

21

22

23

24

25

26

27

28

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  ALLAN YANNOW, State Bar No. 63257
   Deputy Attorney General
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
7   Telephone:  (415) 703-5955
    Fax:  (415) 703-1234
8   Email:  Allan.Yannow@doj.ca.gov

9  Attorneys for Respondent

10              IN THE UNITED STATES DISTRICT COURT

11           FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                  SAN FRANCISCO DIVISION

13

| | |
|---|---|
| **RICHARD DIAZ,** | C 07-2612 VRW (PR) |
| Petitioner, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER** |
| **v.** | |
| **DERRAL ADAMS, Warden,** | |
| Respondent. | |

19

20                  **STATEMENT OF THE CASE**

21          The Monterey County district attorney filed an amended information charging petitioner

22  with one count of second degree robbery, Cal. Penal Code § 211 – count one, one count of grand

23  theft, Cal. Penal Code § 487(c) – count two, and one count of unlawful use of a badge, Cal. Penal

24  Code § 538d(b)(2).  The district attorney alleged that petitioner had suffered three prior strike

25  convictions, Cal. Penal Code, § 1170.12 and one prior conviction pursuant to California Penal Code

26  section 667(a).  CT 93-96.

27          On December 9, 2002, the jury found petitioner guilty on count three.  The jury was

28  unable to reach a verdict on count one and the court declared a mistrial.  The People dismissed count

1  two.  CT 118-120.

2          Retrial on count one began on April 7, 2003.  CT 139.  On April 10, 2003, the jury found

3  petitioner guilty on that count.  CT 147.  On that date the court found the allegations of the priors

4  were true.  CT 147.

5          On June 25, 2003, the court struck two of the strikes, sentenced petitioner to the upper

6  term of five years, doubled it for the remaining strike and imposed a five year term pursuant to Penal

7  Code section 667, subdivision (a).  The court also imposed a concurrent term of 365 days on count

8  three.  Petitioner's total unstayed term was fifteen years.  CT 200, 203.

9          On  the Court of Appeal affirmed the conviction and denied petitioner's petition for writ

10 of habeas corpus.  Exh. F.

11         On June 29, 2005, the California Supreme Court denied review.  Exh. J.

12
                              **STATEMENT OF FACTS**
13
         The Court of Appeal described the facts of the offense as follows:
14

15  According to [Arthur] Peralta's trial testimony, the incident involving defendant took
    place on September 3, 2002. Peralta. . .  parked in front of a Long's drugstore. . . .

16  As Peralta was sitting in his van, four women approached him in another vehicle. The
    woman in the passenger seat asked Peralta if he wanted sex. The driver, who had blonde
17  hair, then told him to follow her if he wanted sex. Peralta followed the women's vehicle
    to the front of a school, where both vehicles parked. At that location, the blonde woman
18  discussed the transaction with Peralta. She asked if he had money, and Peralta said yes.
    He got out of his vehicle and followed the blonde woman onto the school grounds and
19  behind a school building.

20  When Peralta and the blonde woman got behind the school building, two men came
    towards them. One of the men was defendant. Defendant wore a badge on his chest area
21  and carried a flashlight in his hand. He spoke to Peralta, saying, "I'm a policeman. I want
    your I.D." Peralta took out his wallet and defendant grabbed it. The wallet had both
22  American and Philippine cash in it.

23  Peralta tried to grab his wallet back, but he was unsuccessful because defendant hit him
    on the head with a hard object and he became dizzy. Defendant also told the blonde
24  woman to use a stun gun on Peralta, which made him feel weak. At some point during the
    struggle, Peralta lost his dentures. After using the stun gun, defendant and the blonde
25  woman ran away. Peralta chased them and saw defendant drop the wallet and a knife near
    the school gate. Peralta picked up the knife because he was afraid they would stab him
26  with it. As he did so, he saw defendant pick up the wallet and throw it to the blonde
    woman.

27
    After defendant and the blonde woman left the area, Peralta returned to his van and drove
28  to a street corner where he told a passerby he had been robbed. That person called police

on a cell phone. Officer Godwin responded and Peralta told him that someone had stolen his wallet. Peralta also gave the officer a knife. They went back to the school grounds where Officer Godwin recovered Peralta's ATM card, dentures and identification card. Both the ATM card and the identification card were in Peralta's wallet before the incident involving defendant. Peralta also received medical treatment from paramedics, including an ice pack for his head injury.

Peralta gave a description of the perpetrator to Officer Godwin that he relayed to other police officers. Officer Godwin then took Peralta to look at a man who might have been involved in the robbery. Peralta did not recognize the man. Next, Officer Godwin showed Peralta a man who was standing near the school grounds. Peralta identified the man as the one who had robbed him. At that time, defendant was wearing a security officer's badge around his neck.

Officer Sanchez spotted defendant as defendant was walking in the vicinity of the school. Officer Sanchez followed defendant into a motel, where he made contact and observed that defendant was wearing a security officer's badge. Officer Sanchez asked defendant to accompany him to a street corner to meet another officer. As they walked, Officer Sanchez noticed the badge was no longer visible. When Officer Godwin and Peralta met them at the street corner, defendant removed the badge from underneath his sweatshirt at Officer Sanchez's request.

After Peralta identified defendant as the perpetrator, a third officer, Officer Vance, told defendant he was under arrest. Defendant responded that the only wallet he had was his own. Until that time, no one had said anything about a missing wallet in defendant's presence.

The Police Investigation

After defendant was placed under arrest, a friend of Peralta's arrived. The friend assisted in translating some of Peralta's statement to Officer Godwin. However, before the friend provided any assistance, Peralta gave Officer Godwin an account of the robbery that was different from the version Peralta later gave at trial. Peralta stated that he had stopped his van in response to a woman flagging him down and asking him about sex. Three women came to the driver's side window to talk to Peralta. As Peralta was talking to the women, defendant also came to the driver's side window and asked Peralta for identification. Peralta took his wallet out in order to get his identification. As he did so, defendant reached in the van and grabbed the wallet. Defendant also reached for a knife in his waistband, but Peralta took the knife first. Defendant then ran into the school grounds, where Peralta struggled with him to get the wallet back.

Officer Godwin also interviewed defendant. Defendant said that he worked as a security guard at a motel near the school where the robbery took place. He initially stated that he had witnessed the robbery, which had been committed by his brother, another man named Freddy Moreno, and a blonde girl. Defendant then stated that some months ago he, his brother, and Freddy Moreno had worked with a girl to "jack jags." "Jack" means to rob someone, and "jag" is a derogatory term for a Hispanic person. The scheme involved offering the potential victim a soda or a date, meaning an act of prostitution. Defendant's role was to use a badge, rather than force, to take the victim's property.

During the interview, defendant gave Officer Godwin a second statement about the incident. He explained that he "blew it" and struck Peralta on the head with a large flashlight after seeing Peralta in the schoolyard with defendant's mentally retarded, 18-year-old daughter or stepdaughter. Peralta had his wallet in one hand and money in the other hand and was reaching for the young woman. Defendant's knife fell out of his

pocket during the confrontation. Defendant acknowledged that he might have picked up Peralta's wallet and thrown it away from him, before running away.

Defendant then gave a third statement about the incident to Officer Godwin. Defendant said that he thought that Peralta was soliciting his daughter, Victoria S., for prostitution. He approached Peralta, showed him his badge, and asked for identification. At that point, defendant became upset and struck Peralta on the head with his flashlight.

After the interview, Officer Godwin went to defendant's apartment to look for Victoria S. The apartment was on the first floor and Officer Godwin was able to look through a window and see inside defendant's room. He saw a stun gun lying on top of the bed.

Exh. F at 3-6.

## STANDARD OF REVIEW

This court's review of the state court's decision is limited by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254.  The AEDPA permits this Court to grant relief only if  the state court's decision "(1) was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court . . .; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 407-09 (2001), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322 (2003).

To satisfy the "unreasonable application" portion of the first prong, the petitioner must demonstrate that the state court's application of Supreme Court precedent to the facts of his case was not only incorrect but was "objectively unreasonable." *Woodford v. Visciotti*, 537 U.S. 19 (2002).

Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless it is objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2). *Miller-El v. Cockrell*,  537 U.S. 322, 340; *Davis v. Woodford*, 333 F.3d 982, 990-991 (9th Cir. 2003).

Decisions of the Supreme Court are the only ones that can form the basis for habeas relief. "Lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy

1    the AEDPA bar." *Williams v. Taylor*, 529 U.S. 362, 381.  Moreover, this court reviews the state

2    court's decision rather than its reasoning. *Hernandez v. Small*, 282 F.3d 1132, 1140 (9th Cir. 2002).

3            If this Court finds constitutional error, petitioner must show that the error had a substantial

4    and injurious effect on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

5                                          **ARGUMENT**

6                                              **I.**

7    **DEFENSE COUNSEL WAS NOT PREJUDICIALLY INEFFECTIVE**
     **FOR FAILING TO MOVE TO SUPPRESS THE WARRANTLESS VIEW**
8    **OF THE STUN GUN IN PETITIONER'S MOTEL ROOM**

9            Petitioner contends that counsel was ineffective for failing to move to suppress Officer

10   Godwin's observation through a partially open window of the stun gun on petitioner's bed in his

11   motel room.  Godwin testified that he walked down a private pathway to approach the window.  He

12   stood on a milk crate to look through the partially opened window.  A curtain was covering  a

13   portion of the window but it was hanging outside the window.  RT 559.  According to petitioner's

14   investigator the stun gun could not have been seen by anyone who was not very tall, unless he stood

15   on the crate.[1]  Exh. A to State Petition for Writ of Habeas Corpus.  (Exh. K).  Petitioner contends

16   that had counsel made such a motion the evidence would have been suppressed.

17           To obtain relief where an ineffective assistance claim is based on trial counsel's failure

18   to file a timely motion to suppress, a petitioner must prove (1) that counsel's representation fell

19   below an objective standard of reasonableness, (2) that the Fourth Amendment claim is meritorious,

20   and (3) that there is a reasonable probability that the verdict would have been different absent the

21   excludable evidence. *Kimmelman v. Morrison,* 477 U.S. 365, 375 (1986).

22           Petitioner contends that counsel ineffectively failed to seek suppression of testimony that

23   Godwin saw a stun gun on petitioner's bed after he looked through the window of petitioner's motel

24   room.  The state courts denied the claim on the merits without an opinion.  Petitioner's Exh. C and

25   D.  In such cases this Court does not review the matter de novo, but independently reviews the

26   _____

27           1.  Petitioner attached to his state petition for habeas corpus a declaration from an
     investigator.  He also attached a declaration from counsel stating that he did not see any basis for
28   suppressing the view of the stun gun.  See attachments to Exhibit K.

1    record to determine whether the state court's decision is an unreasonable application of clearly

2    established federal law.  *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).

3            Petitioner's burden is to show that the state court's rejection of the claim is based on

4    unreasonable application of *Kimmelman* or of *Strickland v. Washington*, 466 U.S. 668 (1984).  *See*

5    *Woodford v. Visciotti*, 537 U.S. 19, 23 (2002).  If a court can reject a claim of ineffective assistance

6    of counsel on the basis of lack of prejudice, it should do so.  *Strickland*, 446 U.S. at 697.

7            Here, even if the observation of the stun gun resulted from an unreasonable search, the

8    Court of Appeal could reasonably conclude that petitioner had failed to satisfy his burden of

9    showing prejudice, because the observation of the stun gun did not play a significant role in

10    establishing a disputed issue.  Petitioner's identity as to the man who accosted Peralta was not

11    seriously in issue. Petitioner was identified by Peralta.  Petitioner also admitted being at the scene

12    and applying physical force to Peralta.  Petitioner's account of the incident was impeached by the

13    fact that he gave substantially different versions of the incident.  Petitioner also made the comment

14    about the wallet when the police had not mentioned it.  Additionally, petitioner admitted to "jacking

15    jags".  Based on these facts, the state courts could reasonably conclude that the evidence implicating

16    petitioner was so strong that there was no reasonable probability of a more favorable result even if

17    the evidence of the observation of the stun gun had not been admitted.

18            Moreover, petitioner cannot show that the trial court would have suppressed the testimony

19    regarding the view of the stun gun had petitioner moved to exclude it.  In arguing that the

20    observation of the stun gun was unreasonable, petitioner relies on a declaration from an investigator

21    who described the premises and stated that petitioner's room was on the first floor of the motel, that

22    outside petitioner's window was a path with no gate or access control, that the lower edge of

23    petitioner's window was 5'6" high, and that unless one were 6'6" or taller, he would be unable to see

24    petitioner's bed.  Exh. A to Exh. K.  Petitioner relies primarily on *People v. Camacho*, 23 Cal.4th

25    824, 837 (2000), in which the court held that a view through a window was an unreasonable search

26    when the officers, who were investigating an infraction, made their observation from the defendant's

27    yard, an area from which he had the right to exclude the public.  Here, in contrast, the area outside

28    petitioner's window was apparently the property of the motel, and there is no claim that petitioner

1    had the right to exclude anyone from that area.

2         Petitioner also relies on cases in which courts held that officers conducted an unreasonable

3    search when they peered through a small aperture in a closed window.  *State v. Kaaheena*, 59 Haw.

4    23- 29-31, 575 P.2d 462, 467-68 (1978) and *Pate v. Municipal Court*, 11 Cal.App.3d 721, 724

5    (1970).  Here, however, Officer Godwin testified that the window through which he peered was

6    partially open and that a curtain was partially outside the window, RT 559-60.  Although he stepped

7    onto a crate to look through the window, as occurred in *Kaaheena*, unlike the situation in that case,

8    the crate in this case was already under the window, in an area from which petitioner had no right

9    to exclude observers.

10        Additionally, according to the allegations in the declaration, the stun gun would have been

11   visible to a person who was 6'6" or more.  The state courts could reasonably conclude that  people

12   who are of that height are not so uncommon that petitioner can be considered to have evinced a

13   reasonable expectation of privacy.

14        Thus petitioner has not shown that the state court's rejection of this claim involved an

15   unreasonable application of clearly established federal law.

16                                          **II.**

17   **THERE IS NO CLEARLY ESTABLISHED FEDERAL LAW**
     **REQUIRING A UNANIMITY INSTRUCTION ON PRELIMINARY**
18   **FACTS UNDERLYING ONE INCIDENT**

19        Petitioner contends that the trial court violated his constitutional rights by failing to give

20   sua sponte a unanimity instruction.

21        The Court of Appeal rejected this contention stating:

22        Defendant asserts that the trial court's failure to sua sponte give the standard unanimity
          instruction, CALJIC No. 17.01, constitutes reversible error.[FN2] The record reflects that
23        defendant did not ask the trial court to give CALJIC No. 17.01. However, defendant may
          raise the issue on appeal because, absent a request by the defendant, the trial court has a
24        duty to give the instruction where "'where the circumstances of the case so dictate.'"
          [Citation]
25
          FN2. CALJIC No. 17.01 (6th ed.1996) provides: "The defendant is accused of
26        having committed the crime of _____ [in Count _____]. The prosecution has
          introduced evidence for the purpose of showing that there is more than one
27        [act][or] [omission] upon which a conviction [on Count _____] may be based.
          Defendant may be found guilty if the proof shows beyond a reasonable doubt
28        that [he][she] committed any one or more of the [acts] [or] [omissions].

1

2

However, in order to return a verdict of guilty [to Count _____], all jurors must agree that [he][she] committed the same [act][or] [omission] [or] [acts] [or] [omissions]. It is not necessary that the particular [act][or] [omission] agreed upon be stated in your verdict."

3

4

5

6

The unanimity instruction arises from the state constitutional requirement that a jury verdict in a criminal case be unanimous. [Citation.]  For the verdict to be unanimous, the jury must agree that the defendant is guilty of a specific crime. "Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act ." [Citation.]

7

8

9

10

Defendant contends that the trial evidence revealed two possible factual scenarios for the robbery and therefore CALJIC No. 17.01 was required. In one version given to police, Peralta said that defendant grabbed the wallet from his hand while Peralta was seated in his van. Peralta then pursued defendant into the schoolyard where defendant used force to retain possession of the wallet. In the second version, defendant told Officer Godwin that he struck Peralta because Peralta was propositioning his daughter for sex, then took the wallet.

11

12

13

Thus, according to defendant, "[t]he jury heard evidence that the wallet was taken: (1) without force while Mr. Peralta sat in his vehicle; or (2) after the use of force at the schoolyard. Since these acts occurred at different locations and under different factual scenarios, the court had a duty to give [CALJIC] No. 17.01." Defendant also argued that he had asserted a different defense to each factual scenario.

14

15

16

17

The People see the evidence differently. While conceding that the evidence contains conflicting accounts of the robbery, the People urge that only one course of conduct was involved and any factual discrepancies are legally irrelevant. The People also point out that defendant asserted only one defense at trial: that Peralta's versions of the incident lacked credibility, and defendant's least culpable version (whereby defendant assaulted Peralta in the schoolyard but did not take his wallet) should be accepted. Accordingly, they contend that a unanimity instruction was not required.

18

19

20

21

22

As the California Supreme Court has explained, "where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty." [Citation.]  Here, the prosecution's closing argument illustrates that the evidence in this case shows only a single discrete crime: "Whether the defendant hit the victim over the head and then took his wallet or whether he took his wallet and then hit him over the head doesn't matter because either way, the robbery is continuing."

23

24

25

Thus, the evidence showed there was only one possible robbery offense, defendant's seizure of Peralta's wallet by force, arising from one continuous course of conduct. The jurors were not required to unanimously decide exactly how the crime occurred, i.e., whether the defendant used force before or after grabbing the wallet, or whether defendant grabbed the wallet while Peralta was in his car or in the schoolyard. Therefore, the circumstances of this case do not require a unanimity instruction.

26

Exh. F at 7-9.

27

The federal Constitution does not require that the jury agree "on the preliminary factual

28

issues which underlie the verdict." *Schad v. Arizona,* 501 U.S. 624, 631-32 (1991); *United States*

1  *v. Fejes*, 232 F.3d 696, 702 (9th Cir. 2000) (court need not instruct the jury that single set of facts

2  must be agreed upon).  Here there was only one event.  Even if it were possible to disagree as to

3  where exactly petitioner was when he took the wallet or as to when he applied force, *Schad*

4  established that there is no constitutional right to agreement on such preliminary issues, when, as

5  here, there was only one event.  Thus the court's ruling that there was no need to instruct the jury

6  sua sponte on unanimity was not an unreasonable application of clearly established federal law.

7  **III.**

8  **THERE IS NO REASONABLE PROBABILITY THE JURY WOULD
   HAVE INTERPRETED THE INSTRUCTIONS TO PERMIT A**

9  **CONVICTION ON A NON-EXISTENT THEORY OF LIABILITY**

10  Petitioner contends that his due process rights were violated because the jury was

11  instructed on a non-existent theory of liability.  The Court of Appeal addressed this issue as follows:

12  Defendant contends that the trial court erred in giving CALJIC No. 9.40.1, the instruction
    for the offense of aiding and abetting a robbery, because the prosecution theory was that

13  defendant was the direct perpetrator of the robbery. As given, No. 9.40.1 stated, "The
    commission of the crime of robbery is not confined to a fixed place or a limited period of

14  time and continues as long as the stolen property is being carried away to a place of
    temporary safety."[FN3]

15
    FN3. In its entirety, CALJIC 9.40.1 states: "[For the purposes of determining

16  whether a person is guilty as an aider and abettor to robbery, the] [The]
    commission of the crime of robbery is not confined to a fixed place or a limited

17  period of time and continues so long as the stolen property is being carried
    away to a place of temporary safety." The Use Note states that the bracketed

18  introductory phrase is deleted unless the jury is also given CALJIC No. 8.21.1,
    the standard instruction for felony murder in the course of a robbery.

19
    Our Supreme Court has noted that CALJIC No. 9.40.1 "tells the jury that, ''[f]or the

20  purposes of determining whether a person is guilty as an aider and abettor to robbery,''
    the robbery continues so long as the stolen property is being carried away to a place of

21  temporary safety." [Citation.] Defendant's concern is that the instruction allowed the jury
    to find that he was guilty of robbery on the basis of after-acquired intent to steal, because

22  the evidence showed that defendant struck Peralta before he took possession of the wallet
    and carried it away.

23  Exh. F at 10.

24  After noting that an appellate court can review a claim of instructional error if the

25  substantial rights of the defendant were affected thereby even if the defendant did not object, the

26  Court stated:

27  To resolve the issue of whether the trial court committed reversible error in giving

28  CALJIC No. 9.40.1, we apply the standard of review set forth by our Supreme Court in

1   *People v. Guiton* (1993) 4 Cal.4th 1116. First, we determine whether the instruction had
2   any application to the facts of the case. "It is error to give an instruction which, while
    correctly stating a principle of law, has no application to the facts of the case." (*Id.* at p.
3   1129.) We agree with defendant that CALJIC No. 9.40.1 had no application in the present
    case because the prosecution's theory was that defendant was the direct perpetrator of the
4   robbery, not an aider and abettor.

5   We must next decide whether the error in giving CALJIC No. 9.40.1 was prejudicial
    under the *Watson* test. ( *People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Guiton,*
6   *supra,* 4 Cal.4th at p. 1130.) Under *Watson,* giving a jury instruction on an unsupported
    theory constitutes reversible error "only if that theory became the sole basis of the verdict
7   of guilt; if the jury based its verdict on the valid ground, or on both the valid and invalid
    ground, there would be no prejudice, for there would be a valid basis for the verdict."
8   [Citation.] To determine the basis for the guilty verdict, we must examine the entire
    record, including "the facts and the instructions, the arguments of counsel, any
9   communications from the jury during deliberations, and the entire verdict." [Citation.]

10  Having examined the entire record, we conclude that giving CALJIC No. 9.40.1 did not
    constitute prejudicial error. Even if CALJIC No. 9.40.1 allowed the jury to convict
11  defendant on the basis of after-acquired intent to commit robbery, we see nothing in the
    record to show that the jurors convicted defendant on that ground. The trial court gave
12  jury instructions clarifying that the jury could not convict defendant of robbery on the
    basis of after-acquired intent to steal. CALJIC No. 9.40, the standard robbery instruction,
13  was given: "Every person who takes personal property in the possession of another against
    the will and from the person or immediate presence of that person accomplished by means
14  of force or fear and with the specific intent permanently to deprive the person of the
    property is guilty of the crime of robbery, in violation of Penal Code section 211." [FN4]

15      FN4. Section 211 provides, "Robbery defined. Robbery is the felonious taking
        of personal property in the possession of another, from his person or immediate
16      presence, and against his will, accomplished by means of force or fear."

17  In addition, CALJIC No. 9.40.2, as given, instructed the jury: "To constitute the crime of
    robbery, the perpetrator must have formed the specific intent to permanently deprive the
18  owner of his property before or at the time of the taking-at the time of the taking of the
    property occurred. If the intent was not formed until after the property was taken from the
19  person or immediate presence of the victim, the crime of robbery has not been
    committed."
20
21  Thus, the jury instructions were not misleading as a whole, particularly since the jury was
    expressly instructed that it could not convict defendant of robbery on the basis of after-
22  acquired intent. The jury also was instructed with CALJIC No. 17.31, which provides in
    part: "The purpose of the court's instructions is to provide you with the applicable law so
23  that you may arrive at a just and lawful verdict. Whether some instructions apply will
    depend on what you find to be the facts. Disregard any instruction which applies to facts
24  determined by you not to exist." We presume the jury heeded this instruction. [Citation.]

25  Moreover, there was ample evidence that defendant took Peralta's wallet by means of
    force and with the intent to permanently deprive him of it. According to Peralta's trial
26  testimony, defendant grabbed Peralta's wallet after defendant got him to take it out on the
    pretext that defendant was a police officer demanding Peralta's identification. When
27  Peralta tried to grab his wallet back, defendant struck him on the head, directed his
    accomplice to use a stun gun, and fled with the wallet while Peralta was in a weakened
    condition.
28

Memorandum of Points and Authorities in Support of Answer - *Diaz v.Adams* - C 07-2612 VRW (PR)

1    Accordingly, we have found nothing in the record to show that the sole basis of the verdict
2    of guilt on the robbery count was the invalid ground of after-acquired intent to steal. The
     error in giving CALJIC No. 9.40.1 was not prejudicial and therefore reversal is not
3    required.

Exh. F at 11-13.

4

5    Petitioner argues that instruction allowed the jury to convict based on an incorrect theory.

6    The Court of Appeal concluded among other things, that the charge as a whole would have clarified

7    that the jury could not convict petitioner of robbery if he formed the intent to steal after applying

8    force.

9    This court reviews the instruction in the light of whether the jury was reasonably likely

10   to interpret the instruction in an unconstitutional manner. *Estelle v. McGuire* 502 U.S. at 72. A

11   court does not view an instruction in isolation, but construes it in the light of the charge as a whole.

12   *Id.*; *Spivey v. Rocha*, 194 F.3d 971, 976 (9th Cir. 1999).

13   Petitioner has not identified anything in CALJIC No. 9.40.1 that could reasonably be

14   interpreted as permitting a conviction of robbery if the defendant formed the intent to steal only after

15   he finished applying force or instilling fear. The instruction refers to the duration of the robbery

16   rather than the timing of the intent.

17   In any event, the Court of Appeal found that the charge as a whole informed the jury of

18   the correct sequence of events necessary to find petitioner guilty of robbery. That conclusion was

19   not unreasonable in light of the other instructions given, including CALJIC Nos. 9.40 and 9.40.2,

20   which made it clear that robbery required specific intent to steal at or before the taking. See

21   *Middleton v. McNeil*, 541 U.S. 433, 438 (2004) (per curiam).

22   Further, petitioner has not identified any evidence from which the jury could reasonably

23   have found that he committed an assault and took property of the victim, but did not form the intent

24   to steal until after he completed applying all the force he applied or instilling all the fear he instilled

25   during the incident. Under any version of Peralta's testimony, the jury could conclude only that if

26   petitioner was guilty of robbery, it was because he formed the intent to steal before he completed

27   applying force or instilling fear. Under petitioner's version, he never had the intent to permanently

28   deprive Peralta of his property.

Memorandum of Points and Authorities in Support of Answer - *Diaz v.Adams* - C 07-2612 VRW (PR)

11

1    There was simply no evidence from which the jury could conclude that if petitioner struck

2    the victim and took his wallet with the intent to permanently deprive the victim of his property,

3    petitioner formed that intent only after he applied all the force he applied (or instilled all the fear he

4    instilled) during the encounter.  Thus there is no factual basis for a claim that the jury might have

5    convicted petitioner under an incorrect legal theory, and certainly no basis to conclude that the

6    instruction had a substantial and injurious effect on the verdict.

7                                                    **IV.**

8    **THE ADMISSION OF OTHER ACTS EVIDENCE DID NOT DEPRIVE
     PETITIONER OF DUE PROCESS**

9

10    Petitioner contends that the trial court's ruling permitting evidence that petitioner admitted

11    participating in a theft scheme using a badge deprived him of due process.

12    The Court of Appeal discussed this claim as follows:

13    Defendant contends that his statement to Officer Godwin, admitting that he had previously
      participated in theft scheme using a badge, should have been excluded under Evidence
14    Code section 1101, subdivision (a), which bars admission of character evidence to prove
      a crime. According to defendant, this prejudicial error requires reversal of the robbery
15    conviction.

16    During motions in limine in the second trial, defendant moved to exclude the statement
      that defendant had given to Officer Godwin regarding his participation in a scheme
17    defendant termed ''jacking jags,'' which, trial counsel explained, meant "robbing field
      worker type Hispanics." Defendant argued that his statement regarding the uncharged
18    criminal conduct was inadmissible under Evidence Code sections 352 and 1101,
      subdivision (a), because the evidence was unduly prejudicial. The trial court denied the
19    motion and overruled defendant's objection during trial. "When a trial court overrules a
      defendant's objections that evidence is irrelevant, unduly prejudicial and inadmissible
20    character evidence, we review the rulings for abuse of discretion." [Citation.]

21    Evidence Code section 1101 governs the admissibility of character evidence, including
      evidence of uncharged criminal conduct. Subdivision (a) of section 1101 provides that
22    "evidence of a person's character or a trait of his or her character (whether in the form of
      an opinion, evidence of reputation, or evidence of specific instances of his or her conduct)
23    is inadmissible when offered to prove his or her conduct on a specified occasion."
      Exceptions to this rule are provided in subdivision (b), which states in part: "Nothing in
24    this section prohibits the admission of evidence that a person committed a crime, civil
      wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent,
25    preparation, plan, knowledge, identity, absence of mistake or accident, . . ."

26    The California Supreme Court has construed Evidence Code section 1101 to limit the
      admissibility of uncharged criminal conduct evidence to certain purposes: "Evidence that
27    a defendant has committed crimes other than those currently charged is not admissible to
      prove that the defendant is a person of bad character or has a criminal disposition; but
28    evidence of uncharged crimes is admissible to prove, among other things, the identity of

the perpetrator of the charged crimes, the existence of a common design or plan, or the intent with which the perpetrator acted in the commission of the charged crimes." [Citation.]

The admissibility of uncharged criminal conduct evidence is further limited by the requirement of similarity. "Evidence of uncharged crimes is admissible to prove identity, common design or plan, or intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference of identity, common design or plan, or intent." [Citation.]

In the present case, evidence of defendant's uncharged criminal conduct was introduced through the testimony of Officer Godwin regarding defendant's "jacking jags" statement. Defendant told Officer Godwin that, some months prior to the subject robbery, he, Freddy Moreno, and his brother Juan would "jack jags." Officer Godwin explained, "'Jack' means to rob someone and 'jag' is a derogatory term used against Hispanics." Defendant also said that two men and a girl would work together. They would offer a person a soda or date, meaning an act of prostitution. Defendant's involvement in the scheme was to "use a badge so as not to use force to take the property."

The prosecution argued that defendant's "jacking jags" scheme was evidence of a common plan or design that defendant had also employed in committing the current offense: "And from his own mouth to Officer Godwin, we know that the scam he described is exactly what the victim described. [¶] Now, he also admitted to Officer Godwin that in the scam, he would use a badge. That was his part. Why would you need a badge? To identify yourself as a police officer so that you could get a victim to willingly pull out their wallet so that you could then grab it. What a surprise. That's what happened here." Thus, the prosecution sought to use uncharged offense evidence to show that in committing the current offense, defendant was acting with the intent to steal.

Defendant contends that his "jacking jags" statement should have been excluded because the uncharged criminal conduct was insufficiently similar since no force was used. Admission of the statement in violation of Evidence Code section 1101 constituted prejudicial error, according to defendant, because "the defense theory of the case was that [defendant] was not guilty of robbery since he did not use force to effectuate a robbery but solely out of frustration [ sic ] due to Mr. Peralta's act of propositioning his daughter. By allowing admission of [defendant's] prior acts of thievery, the trial court eviscerated the defense since the jury was improperly allowed to conclude that [defendant] necessarily intended to commit a theft when he hit Mr. Peralta."

We are not persuaded. Under the standard established by our Supreme Court, there was sufficient similarity between the "jacking jags" scheme and the current robbery offense to admit the uncharged offense evidence on the issue of intent. "The least degree of similarity is required to establish relevance on the issue of intent. [Citation.] For this purpose, the uncharged crimes need only be 'sufficiently similar [to the charged offenses] to support the inference that the defendant "probably harbor[ed] the same intent in each instance." [Citations] Thus, the uncharged crimes need not be identical to the charged offenses.

Here, there is a strong similarity between the uncharged criminal conduct and the charged offense. The uncharged criminal conduct involved a scheme whereby defendant would steal property from individuals by working with a female accomplice, who would solicit an act of prostitution from the victim. Defendant would then use a badge to obtain the victim's property without the use of force. The charged offense likewise involved a female accomplice, a solicitation for an act of prostitution, and a police officer ruse. According to Peralta's trial testimony, defendant worked with a blonde woman who solicited an act

of prostitution from Peralta. Defendant then appeared with a badge, identified himself as a police officer, and demanded Peralta's identification, which led to Peralta taking out his wallet and defendant grabbing it. Thus, the charged and uncharged offenses are sufficiently similar to support the inference that, in each instance, defendant probably intended to steal the victim's property.

Finally, we are mindful of the "additional requirement for the admissibility of evidence of uncharged crimes: The probative value of the uncharged offense evidence must be substantial and must not be largely outweighed by the probability that its admission would create a serious danger of undue prejudice, of confusing the issues, or of misleading the jury." [Citation.]  No such danger was present in this case. The probative value of the evidence of the " 'jacking jags' " scheme on the issue of intent was substantial in light of the defense theory that defendant had assaulted Peralta under the belief that Peralta was propositioning defendant's daughter, with no intent to steal. Further, it was unlikely that the evidence of the uncharged offenses confused or misled the jury, given the simplicity of the " 'jacking jags' " scheme and its similarity to the current offense. The probative value of the uncharged offense evidence consequently outweighed the danger of undue prejudice.

For these reasons, we conclude that the trial court did not abuse its discretion in denying defendant's motion under Evidence Code section 1101 to exclude evidence of the uncharged " 'jacking jags' " theft scheme and in admitting the evidence at trial.

Exh. F at 13-17.

A federal habeas court will not disturb a state court's evidentiary ruling unless the admission of the evidence "so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire,* 502 U.S. 62, 72 (1991).  Thus the Ninth Circuit has held that state courts do not unreasonably apply clearly established federal law when they admit other acts evidence from which the jury can draw a permissible inference. *Windham v. Merkle,* 163 F.3d 1092, 1103 (9th Cir.1998); *Jammal v. Van de Kamp,* 926 F.2d 918, 920 (9th Cir. 1991).  The admission of other acts evidence does not violate due process when the jury could draw an inference of intent from that evidence.  *Houston v. Roe*, 177 F.3d 901, 910 n. 6 (9th Cir. 1949).  Here, the state court reasonably concluded that the other acts evidence was directly relevant to showing petitioner's intent in accosting Peralta.  Thus the admission of that evidence did not violate due process.

## V.

### SUBSTANTIAL EVIDENCE SUPPORTS THE VERDICT ON THE COUNT OF UNLAWFUL USE OF A BADGE

Petitioner contends that the evidence is insufficient to support his conviction of unlawful use of a badge in violation of Cal. Penal Code § 538 (b)(2).

1    The Court of Appeal described the pertinent facts as follows:

2    Section 538d, subdivision (b)(2), provides in part: "Any person who willfully wears or
     uses any badge that falsely purports to be authorized for the use of one who by law is
3    given the authority of a peace officer, or which so resembles the authorized badge of a
     peace officer as would deceive any ordinary reasonable person into believing that it is
4    authorized for the use of one who by law is given the authority of a peace officer, for the
     purpose of fraudulently impersonating a peace officer, or of fraudulently inducing the
5    belief that he or she is a peace officer, is guilty of a misdemeanor. . . ."

6    Defendant argues that the conviction is not supported by sufficient evidence because the
     badge worn by defendant does not resemble an authorized City of Salinas police officer
7    badge and therefore it would not deceive a reasonable citizen into believing that he was
     a police officer. In particular, defendant points out that the wording and symbols on his
8    badge are different. Defendant's badge bears the words "Security Special Officer" and
     "Liberty & Justice For All." The symbols include the Liberty Bell and two United States
9    flags. [FN5] We granted defendant's request for judicial notice of the wording on a genuine
     City of Salinas police officer's badge, which states, "City of Salinas Police Officer,"
10   "Salinas California," and bears the police officer's name. We also granted judicial notice
     of the fact that the symbols on a City of Salinas police officer badge include a picture of
11   an agricultural field and a hill.

12        FN5. Defendant's badge was admitted into evidence and transmitted to this
          court as part of the record on appeal.
13

14   The parties have not cited and we have not found through independent research any
     California decisions that provide guidance in determining when an unauthorized badge
15   sufficiently resembles an authorized police officer's badge for purposes of section 538d,
     subdivision (b)(2). [footnote.] However, to determine whether sufficient evidence
16   supports the conviction of unlawful use of a badge, we follow a well established rule. We
     "review the whole record in the light most favorable to the judgment below to determine
17   and decide whether it discloses substantial evidence . . . such that a reasonable trier of fact
     could find the defendant guilty beyond a reasonable doubt." [Citation.] Under this
18   standard, the court does not " ' "ask itself whether it believes that the evidence at the trial
     established guilt beyond a reasonable doubt." [Citation.] Instead, the relevant question is
19   whether, after viewing the evidence in the light most favorable to the prosecution, *any*
     rational trier of fact could have found the essential elements of the crime beyond a
20   reasonable doubt.' [Citation.]" (*People v. Hatch* (2000) 22 Cal.4th 260, 272, quoting
     *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319.)

21   Viewing the record in the light most favorable to the judgment, we find substantial
     evidence to support defendant's conviction of unlawful use of a badge under section 538d,
22   subdivision (b)(2). Defendant implicitly concedes two elements of the offense. First, it is
     undisputed that defendant was wearing a badge during the incident involving Peralta.
23   Second, defendant does not challenge the sufficiency of the evidence showing that he
     willfully used a badge to impersonate a police officer. Defendant only challenges the
24   element requiring the badge used in the offense to "so resembl[e] the authorized badge of
     a peace officer as would deceive any ordinary reasonable person into believing that it is
25   authorized for the use of one who by law is given the authority of a peace officer." (§
     538d, subd. (b)(2).)
26

27   We have examined the evidence pertaining to the appearance of the two badges. At trial,
     Peralta identified the badge admitted into evidence as the badge worn by defendant during
28   the commission of the robbery. Officer Sanchez also identified that badge as the one worn
     by defendant at the time he was arrested. Further, Officer Godwin identified the badge as

1   the one given to him by Office Sanchez on the night of the offense. Officer Godwin also
    displayed his own City of Salinas police officer's badge, and agreed to the following
2   description of the badge that the prosecutor placed on the record: "[I]t appears to be a
    silver star with some writing in the center and a black circular leather backing." Officer
3   Godwin's badge was not admitted into evidence.

4   We have examined defendant's badge and find the prosecutor's comparison of that badge
    with Officer Godwin's authorized badge, which the officer displayed during his
5   testimony, to be accurate. The prosecutor stated, "You remember I had Officer Godwin
    show you his badge. It was a black leather oval backing with a silver star attached in front
6   of it. You look at the defendant's security badge, it's a black leather oval backing with a
    silver star attached. Really, the only difference is the fact that the defendant wore his
7   around his neck, and that the wording, if you were able to get close enough to read the
    wording, is clearly different." Trial counsel did not object to this description.
8
    We do not agree with defendant that the difference in the wording and symbols on the two
9   badges precluded the jury from finding that the badge used by defendant sufficiently
    "resembles the authorized badge of a peace officer as would deceive any ordinary
10  reasonable person" into believing that the badge was an authorized police officer's badge.
    (§§ 538d, subd. (b)(2).) As the prosecutor pointed out, the two badges resemble each other
11  in their most visible aspects, including the shape (oval), the color (black), and the largest
    symbol (a silver star). An ordinary reasonable person could be deceived by these obvious
12  similarities, without making a detailed comparison of the much smaller, less visible words
    and symbols.
13
    Accordingly, having viewed the evidence in the light most favorable to the prosecution,
14  we determine that a rational trier of fact could have found the essential elements of the
    crime beyond a reasonable doubt. Therefore, we conclude that there is sufficient evidence
15  to support the conviction for unlawful use of a badge.

16  Exh. F at 18-21.

17      On review this Court determines wether the state court unreasonably applied *Jackson v.*

18  *Virginia*, 443 U.S. 307 (1979).  *See Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005).  Under

19  *Jackson*, evidence is constitutionally sufficient when, upon viewing the evidence in the light most

20  favorable to the prosecution, "any rational trier of fact could have found the essential elements of

21  the crime beyond a reasonable doubt."  *Jackson* at 319, emphasis in original.

22      Petitioner's argument is in substance that there were enough dissimilarities between the

23  badges that one did not sufficiently resemble the other.  However, the state court noted that there

24  were substantial similarities between the badges.  Even though there were some differences between

25  them, the court did not consider those differences so significant that a reasonable jury could not find

26  that the two badges resembled each other to the point that a reasonable person would have been

27  deceived by the one petitioner displayed.

28      Since the Court of Appeal noted that the badges resembled each other in their most visible

1 aspects, and petitioner displayed the badge for the very purpose of inducing the victim to believe

2 that he was a policeman,  the Court could reasonably conclude that there was substantial evidence

3 from which a rational trier of fact could have found petitioner guilty of a violation of Penal Code

4 section 538(b).

5

6                                                     **VI.**

7   **THE TERM THE COURT IMPOSED WAS LESS THAN THE**
    **MAXIMUM TERM THAT COULD HAVE BEEN IMPOSED BASED ON**
8   **THE JURY'S FINDINGS AND PETITIONER'S ADMISSIONS**

9          Petitioner contends that the court improperly imposed the aggravated term without holding

10 a jury trial on the factors in aggravation.  The Court of Appeal described the relevant facts as

11 follows:

12     The trial court struck two of the three prior strike convictions for robbery in the interests
       of justice under section 1385. The trial court then sentenced defendant to a total term of
13     15 years on count one (robbery; § 211.) The sentence included the upper term of five
       years, doubled pursuant to section 1170.12, subdivision (c)(1),[FN7] plus a five-year
14     enhancement pursuant to section 667, subdivision (a).[FN8]

15         FN7. Section 1170.12, subdivision (c)(1), provides: "For purposes of this
           section, and in addition to any other enhancements or punishment provisions
16         which may apply, the following shall apply where a defendant has a prior
           felony conviction: [¶] (1) If a defendant has one prior felony conviction that has
17         been pled and proved, the determinate term or minimum term for an
           indeterminate term shall be twice the term otherwise provided as punishment
18         for the current felony conviction."

19         FN8. Section 667, subdivision (a), provides in pertinent part: "(a) (1) In
           compliance with subdivision (b) of Section 1385, any person convicted of a
20         serious felony who previously has been convicted of a serious felony in this
           state or of any offense committed in another jurisdiction which includes all of
21         the elements of any serious felony, shall receive, in addition to the sentence
           imposed by the court for the present offense, a five-year enhancement for each
22         such prior conviction on charges brought and tried separately. The terms of the
           present offense and each enhancement shall run consecutively.
23
       In deciding to impose the upper term, the trial court made several findings: "The Court
24     finds the following factors in aggravation apply, great violence, viciousness and
       callousness. The manner in which the crime was committed indicates plenty of
25     sophistication and professionalism. The defendant has engaged in a violent pattern which
       indicates a danger to society. The defendant's prior convictions are numerous, the
26     defendant's prior probation or parole, the Court finds no factors in mitigation."

27 Exh. F at 23-24.

28         The Court then addressed that petitioner's contention that *Blakely v. Washington*, 542 U.S.

Memorandum of Points and Authorities in Support of Answer - *Diaz v.Adams* - C 07-2612 VRW (PR)

296 (2004), required that the sentence be reversed.  After concluding that petitioner had not forfeited

this claim by not raising it at trial, it stated:

> We first consider the People's argument that imposition of the upper term of five years did not violate the principles of *Blakely* because five years is less than the statutory maximum for defendant's offense. The People explain that the statutory maximum is a Three Strikes sentence of 26 years to life, [footnote deleted] pursuant to sections 667.17 and 1170.12, subdivision (c), because the trial court found true the allegations that defendant had three prior strike convictions. We agree that the sentence imposed is less than the statutory maximum.

> A trial court's decision to strike prior strike convictions does not change the facts on which a maximum statutory sentence of 25 years to life is authorized under the Three Strikes law. As our Supreme Court explained in *People v. Garcia* (1999) 20 Cal.4th 490, "[I]n a Three Strikes case, as in other cases, when a court has struck a prior conviction allegation, it has not 'wipe[d] out' that conviction as though the defendant had never suffered it; rather, the conviction remains a part of the defendant's personal history, and a court may consider it when sentencing the defendant for other convictions, including others in the same proceeding." (*Id.* at p. 499; see also *People v. Wallace* (2004) 33 Cal.4th 738, 748.)

> In the present case, defendant waived his right to a jury trial on the allegations that he had three prior strike convictions of robbery.[FN11] The trial court found the allegations true. Accordingly, the statutory maximum sentence for which defendant is eligible is 25 years to life under the Three Strikes law. (§ 1170.12, subd. (c)(2).) The trial court's decision to strike two of the three prior strike convictions did not change the facts on which a maximum statutory sentence of 25 years to life is authorized. Because the upper term imposed by the trial court is five years, less than the statutory maximum, the sentence did not violate the principles of *Blakely.*

>> FN11. We note that under *Blakely,* jury determination of the fact of a prior conviction is not required. ( *Blakely, supra,* 124 S.Ct. at pp. 2536-2537, fn. 5.)

> Having reached this conclusion, we need not address the People's additional contentions that *Blakely* does not apply to California's determinate sentencing law and the trial court may consider the aggravating factor of numerous prior convictions not found by the jury under California Rules of Court, rule 4.421(b)(2).

Exh. F at 25-26.

As the Court of Appeal noted, *Blakely* applies only to the decision to impose a sentence

greater than that which it could have imposed based on the jury's findings and the facts the

defendant admitted. Here, since the maximum term the court could have imposed based on the jury's

findings and the findings the court made after a jury waiver on the priors, was one that carried a

potential life term, the court did not unreasonably apply *Blakely* by imposing the upper term on

count one.  Furthermore, as the Court of Appeal also noted, the trial court could properly have

imposed the upper term based on petitioner's multiple prior convictions.  *Blakely*, 542 U.S. at 301.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

**CONCLUSION**

2

3    Accordingly, respondent respectfully requests that the petition for writ of habeas corpus

4    be denied.

5    Dated:  November 15, 2007

6    Respectfully submitted,

7    EDMUND G. BROWN JR.
     Attorney General of the State of California

8    DANE R. GILLETTE
     Chief Assistant Attorney General

9

10   GERALD A. ENGLER
     Senior Assistant Attorney General

11   PEGGY S. RUFFRA
     Supervising Deputy Attorney General

12

13   /s/  ALLAN YANNOW

14   Deputy Attorney General

15   Attorneys for Respondent

16   AY/cfl
     20110124.wpd

17   SF2007402444

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

**Page**

3   STATEMENT OF THE CASE                                                                                    1

4
    STATEMENT OF FACTS                                                                                       2
5
    STANDARD OF REVIEW                                                                                       4
6
    ARGUMENT                                                                                                 5
7
       I.    DEFENSE COUNSEL WAS NOT PREJUDICIALLY
8           INEFFECTIVE FOR FAILING TO MOVE TO SUPPRESS THE
            WARRANTLESS VIEW OF THE STUN GUN IN PETITIONER'S
9           MOTEL ROOM                                                 5

10     II.   THERE IS NO CLEARLY ESTABLISHED FEDERAL LAW
            REQUIRING A UNANIMITY INSTRUCTION ON
11          PRELIMINARY FACTS UNDERLYING ONE INCIDENT                  7

12     III.  THERE IS NO REASONABLE PROBABILITY THE JURY
            WOULD HAVE INTERPRETED THE INSTRUCTIONS TO
13          PERMIT A CONVICTION ON A NON-EXISTENT THEORY OF
            LIABILITY                                                  9
14
       IV.  THE ADMISSION OF OTHER ACTS EVIDENCE DID NOT
15          DEPRIVE PETITIONER OF DUE PROCESS                          12

16     V.   SUBSTANTIAL EVIDENCE SUPPORTS THE VERDICT ON
            THE COUNT OF UNLAWFUL USE OF A BADGE                       14
17
       VI.  THE TERM THE COURT IMPOSED WAS LESS THAN THE
18          MAXIMUM TERM THAT COULD HAVE BEEN IMPOSED
            BASED ON THE JURY'S FINDINGS AND PETITIONER'S
19          ADMISSIONS                                                 17

20  CONCLUSION                                                                                              19

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2                                                                                           **Page**

3  **Cases**

4

5  *Blakely v. Washington*,
   542 U.S. 296 (2004)                                                              17, 18

6  *Brecht v. Abrahamson*,
   507 U.S. 619 (1993)                                                                   5

7

8  *Davis v. Woodford*,
   333 F.3d 982 (9th Cir. 2003)                                                          4

9  *Estelle v. McGuire*,
   502 U.S. 62 (1991)                                                                   14

10

11 *Hernandez v. Small*,
   282 F.3d 1132 (9th Cir. 2002)                                                         5

12 *Himes v. Thompson*,
   336 F.3d 848 (9th Cir. 2003)                                                          6

13

14 *Houston v. Roe*,
   177 F.3d 901 (9th Cir. 1949)                                                         14

15 *Jackson v. Virginia*,
   443 U.S. 307 (1979)                                                                  16

16

17 *Jammal v. Van de Kamp*,
   926 F.2d 918 (9th Cir. 1991)                                                         14

18 *Juan H. v. Allen*,
   408 F.3d 1262 (9th Cir. 2005)                                                        16

19

20 *Kimmelman v. Morrison*,
   477 U.S. 365 (1986)                                                                   5

21 *Middleton v. McNeil*,
   541 U.S. 433 (2004) (per curiam)                                                     11

22

23 *Miller-El v. Cockrell*,
   537 U.S. 322 (2003)                                                                   4

24 *People v. Camacho*,
   23 Cal.4th 824 (2000)                                                                 6

25

26 *Schad v. Arizona*,
   501 U.S. 624 (1991)                                                                   8

27 *Spivey v. Rocha*,
   194 F.3d 971 (9th Cir. 1999)                                                         11

28

**TABLE OF AUTHORITIES  (continued)**

**Page**

*State v. Kaaheena*,
59 Haw. 23- 29-31,
575 P.2d 462 (1978)                                                  7

*Strickland v. Washington*,
466 U.S. 668 (1984)                                                  6

*United States v. Fejes*,
232 F.3d 696 (9th Cir. 2000)                                         8

*Williams v. Taylor*,
529 U.S. 362 (2001)                                                  4

*Windham v. Merkle*,
163 F.3d 1092 (9th Cir.1998)                                        14
*Woodford v. Visciotti*,
537 U.S. 19 (2002)                                                4, 6


**Statutes and Other Authorities**

28 U.S.C.
      § 2254                                                    4
      § 2254(d)                                                 4
      § 2254(e)(1)                                              4

California Penal Code
      § 211                                                     1
      § 487(c)                                                  1
      § 538 (b)(2)                                          14, 17
      § 538d(b)(2)                                              1
      § 667(a)                                               1, 2
      § 1170.12                                                 1

CALJIC
      No. 9.40                                                 11
      No. 9.40.1                                               11
      No. 9.40.2                                               11